STATE OF NORTH CAROLINA v. ROBERT LEE DRUMGOLD

No. 105

(Filed 17 May 1979)

**Rape § 6.1— first degree rape case—error in failing to submit second degree rape**

    In this prosecution for first degree rape in which the State presented evidence that defendant overcame the victim's resistance by the use of a gun, the trial court erred in failing to submit second degree rape to the jury as a possible verdict where defendant presented evidence through several witnesses that he did not have a gun on the day in question, and where evidence that defendant at one point threatened to kill the victim and that the victim had an abrasion on her face would support a jury finding that the victim submitted to intercourse with defendant because of fear or duress.

APPEAL by defendant from the judgment of *Graham, S.J.*, entered in the 27 September 1978 Criminal Session of FRANKLIN County Superior Court.

The defendant was charged, in an indictment proper in form, with first degree rape.

At trial the evidence for the State tended to show the following:

At about 9:00 a.m. on 6 June 1978 the defendant went to Mrs. Lizzie Epps' house in Vance County with a person named Jethro. Mrs. Epps was separated from her husband, and she had known the defendant for about two years, during which time she had seen the defendant often. Mrs. Epps asked the defendant to take her and her baby to the doctor because the baby was sick.

The defendant, Jethro, Mrs. Epps and her baby left in defendant's car and went to Harry Mitchell's house. While there Mrs. Epps drank some milk, and the defendant drank "some whisky mixed with milk." Mrs. Epps stated that she did not drink any alcohol. The four of them left after about fifteen minutes and went to Jethro's house. Mrs. Epps, her baby and Jethro entered the house. The defendant took a gun from the back of his car and shot it two times into an open field, reloaded it and put it back into his car.

Mrs. Epps, her baby and the defendant then left and drove to Albert Terry's house. The defendant asked Mrs. Epps if she were

going inside. When she replied no, the defendant pointed the gun at her and said, "I got something that can make you get out." Mrs. Epps testified that she then went into the house with the defendant because she was scared.

Albert Terry and his girlfriend, later identified as Mamie Mitchell, were inside. Mrs. Epps sat on a bed. The defendant came over to her with the gun in his hand, forced her to lie down and started sucking her breasts. He then made her go into the other room and forced her to take off her clothes. The defendant laid the gun on a table beside the bed and had sexual intercourse with Mrs. Epps two or three times. She testified that "I [Mrs. Epps] had sexual intercourse with [the defendant] because I was scared and he had the gun. . . . I did not want to have sexual intercourse with [him] on each of these times."

At one point the defendant put some "hickies" on Mrs. Epps, and he told her that she could show them to her boyfriend, Bay Boy. "He [the defendant] told me [Mrs. Epps] to tell Bay Boy that it didn't make no difference because he had killed one man and got away with it and he feel like he could kill another one and he would do the same thing to me if I tell it."

Astor Bowden, a Deputy Sheriff of Franklin County, testified that he saw Mrs. Epps at about 6:00 p.m. on 6 June 1978, and she appeared nervous and upset. The officer recounted what Mrs. Epps had told him about the above events, which essentially corroborated Mrs. Epps' testimony.

The evidence for the defendant tended to show the following:

Mamie Seward testified that about 9:30 a.m. on 6 June 1978 the defendant, Jethro, Mrs. Epps and her baby came to the house in which she and Harry Mitchell lived. All of them, including Mrs. Epps, drank milk and vodka, and Mrs. Epps got up and was dancing by herself. The witness stated that when they arrived, "Mrs. Epps appeared to me to have been drinking" and that "when [the defendant] and Lizzie Epps were with each other they were just laughing and talking."

Carrie Pew Lemay testified that these same four people came to her house where she and Jethro lived on the morning of 6 June 1978 and that "Lizzie had been drinking. I could see it in

her eyes and tell it by her ways." Ms. Lemay saw Mrs. Epps drink some white vodka straight out of the bottle at her house. The witness wanted to ride with the defendant, Mrs. Epps and her baby when they left, but Mrs. Epps said no "because she and [the defendant] had something to do." Ms. Lemay stated that she never saw a pistol or a gun and did not hear any shots fired. "I [Ms. Lemay] am positive that [the defendant] did not go to the boot of the car to get a pistol out and shoot it. If that had happened, I would have seen it."

On cross-examination Ms. Lemay denied ever having been intimate with the defendant, and she denied ever having told a law officer that the defendant had raped her six times. She had told an officer that she and the defendant were friends. Ms. Lemay testified that she was not afraid of the defendant.

Albert Terry testified that the defendant, Mrs. Epps and her baby came to his house about noon on 6 June 1978. There are only two rooms in his house with no door between them. Mr. Terry and his girlfriend, Mamie Mitchell, had been working in the tobacco field. When they returned to the house from the fields, the defendant and Mrs. Epps were sitting on the front porch playing with the baby. Mr. Terry and Ms. Mitchell stayed at the house about ten or fifteen minutes and then went back to work. Neither the defendant nor Mrs. Epps entered the house while he was there, and those two left about ten minutes after Mr. Terry returned to the fields.

Mamie Mitchell testified that the defendant, Mrs. Epps and her baby were in the yard when she and Albert Terry came to their house from the tobacco field. They all went inside, and Mr. Terry and Ms. Mitchell ate lunch. When the two of them left to go back to work, the defendant and Mrs. Epps were just talking. Ms. Mitchell stated that she never saw the defendant and Mrs. Epps have sexual relations in the house. While in the field nearby, she would have heard any screams coming from the house if there had been any. This witness also testified that she had known the defendant for quite some time, and she had never seen him with a pistol or a gun.

On cross-examination Ms. Mitchell denied having told any law officer that the defendant had a gun, and she denied ever having

State v. Drumgold

told Mrs. Epps that she could not help her because the defendant was her friend.

The defendant took the stand on his own behalf. He stated that he knew Mrs. Epps quite well and often took her places she needed to go. When he and Jethro went to Mrs. Epps' home on 6 June 1978 the house was in a shambles; the furniture was all moved around and the bed was torn up. Mrs. Epps asked him to get some liquor, so the defendant went out and bought a half-gallon of vodka. Mrs. Epps told the defendant that "I'm going to mess around and be drunk today and when Bay Boy comes I'm going to be drunk."

The defendant testified to the series of events on the morning of 6 June 1978; however, he said that he and Mrs. Epps did not engage in sexual intercourse at Albert Terry's house. After they left there, the defendant and Mrs. Epps went to a store, and he bought some condoms. Mrs. Epps asked the defendant for some money, and he gave her $13.00. The defendant then drove down a road, and he and Mrs. Epps had intercourse in the front seat of the car. The defendant stated that Mrs. Epps took off her clothes voluntarily, and "she did not resist in any way and she did not tell me not to do it."

Thereafter the defendant asked Mrs. Epps to return some of the money he had previously given her because she told him she was not going to take her baby to the doctor. She refused, so the defendant took it. Mrs. Epps got mad and hit the defendant on the side of his head with a rock, and the two of them were "tussling." The defendant then took Mrs. Epps home, but she was still mad at him and kept asking for the money. The defendant stated that "I did not have a pistol in the automobile at that time and I don't even own a pistol."

On rebuttal evidence for the State, Officer Aiken stated that during his investigation of this case, Carrie Pew Lemay told him that the defendant was at her house on 6 June 1978 with a gun, and he had shot it a few times in a field. She was upset and crying and told the officer that "she was afraid of him [the defendant] because he had raped her about six times."

Officer Aiken also testified that he had talked with Mamie Mitchell, who told him that Albert Terry was not at home on 6

June 1978 when the defendant and Mrs. Epps were there. Ms. Mitchell had also stated to the officer that the defendant had a gun and that Mrs. Epps had asked her for help but she told Mrs. Epps she could not help her because the defendant was her friend.

Both Ms. Lemay and Ms. Mitchell took the stand on defendant's surrebuttal evidence and denied having made those statements to Officer Aiken.

*Thomas F. East and G. Hugh Moore, Jr. for the defendant.*

*Attorney General Rufus L. Edmisten by Assistant Attorney General Isham B. Hudson, Jr. for the State.*

COPELAND, Justice.

The defendant contends the trial court erred in not submitting second degree rape to the jury as an alternative to a verdict of first degree rape. We agree; therefore, the defendant must be granted a new trial.

It is well settled that "a defendant is entitled to have all lesser degrees of offenses supported by the evidence submitted to the jury as possible alternate verdicts." *State v. Palmer,* 293 N.C. 633, 643-44, 239 S.E. 2d 406, 413 (1977). On the other hand, the trial court need not submit lesser degrees of a crime to the jury "when the State's evidence is positive as to each and every element of the crime charged *and there is no conflicting evidence relating to any element of the charged crime.*" *State v. Harvey,* 281 N.C. 1, 13-14, 187 S.E. 2d 706, 714 (1972). (Emphasis added.)

In this case, a conviction of first degree rape depended, *inter alia,* on proof that the defendant overcame Mrs. Epps' resistance by the use of a deadly weapon. *See* G.S. 14-21(1)(b) (1977 Cum. Supp.). The defendant presented evidence through several witnesses that he did not have a gun on the day in question. Therefore, there was conflicting evidence on an essential element of the crime charged. Furthermore, there was evidence that at one point the defendant threatened to kill Mrs. Epps, and Officer Bowden testified that when he saw Mrs. Epps on 6 June 1978, "she had what appeared to be an abrasion on the left side of her face." The jury could have found that Mrs. Epps submitted to in-

tercourse with the defendant because of fear or duress. *See generally, State v. Dull,* 289 N.C. 55, 220 S.E. 2d 344 (1975), death sentence vacated in 428 U.S. 904, 49 L.Ed. 2d 1211, 96 S.Ct. 3211 (1976). Under these facts, the trial court should have submitted second degree rape to the jury as a possible verdict. Its failure to do so entitles the defendant to a new trial.

We need not discuss defendant's two other assignments of error, as they are not likely to recur at the new trial.

For the foregoing reason, we order that defendant be granted a

New trial.